**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

LEWIS BALL,                                )
                                           )
            Plaintiff,                     )          Case No. 11-cv-8741
                                           )
    v.                                     )          Judge Robert M. Dow, Jr.
                                           )
JUDITH CORTES, MARCUS DUNCAN,              )
JOHN THILL, HUGO SALGADO, and              )
CITY OF CHICAGO,                           )
                                           )
            Defendants.                    )

**MEMORANDUM OPINION AND ORDER**

Plaintiff Lewis Ball ("Ball") brings suit against Chicago Police Officers Judith Cortes, Marcus Duncan, John Thill, and Hugo Salgado, for excessive force in violation of Ball's Fourth and Fourteenth Amendment rights as protected by 42 U.S.C. § 1983 (Count I). Ball also brings a claim for indemnification against the City of Chicago (Count II). Currently before the Court is Defendant Hugo Salgado's ("Salgado") motion [89] for summary judgment on Count I. For the following reasons, Salgado's motion [89] is respectfully denied. This case is set for further status hearing at 9:30 a.m. on March 6, 2018.

**I.      Background**

Ball's claims stem from an incident in which Ball was shot by Chicago Police Officers Judith Cortes, Marcus Duncan, John Thill, and Hugo Salgado. The shooting occurred after several of the officers chased the vehicle that Ball was driving from the area of 5400 S. Indiana to the area of 5600 S. Calumet in Chicago on December 29, 2009. [90, ¶ 1.]

The following facts are drawn primarily from the parties' Local Rule 56.1 statements of facts and supporting exhibits [90], [92], [94], and [96]. Because Officer Salgado was not

involved in the initial police chase of Ball, these statements do not focus on the facts of the chase itself and the events leading up to it and instead concentrate on the events relating to Officer Salgado's arrival at the scene and the shooting itself.[1]

During the pursuit of his vehicle by police officers on the night of December 29, 2009, Ball drove into an alley off of Calumet, turned south, and then continued driving southbound down the sidewalk on Calumet. Ball then brought his car to a stop in the area of 5600 S. Calumet. [90 ¶ 3; 92, ¶¶ 1–2]. According to Ball, his car came to a stop after he attempted to turn his vehicle westbound through a vacant lot at the corner of 57th and Calumet, but the car became stuck in the snow. [92, ¶ 11; 90, Exhibit 1 (Ball Deposition), at 124:2–8]. Ball's car was facing south when it came to a stop. [90, ¶ 3; 90, Exhibit 1 (Ball Deposition), at 124:2–8].

According to Defendant Officer Cortes, one of the officers involved in the chase of Ball, she parked her unmarked police vehicle opposite Ball's car and then approached Ball's car from the front (*i.e.*, she had parked her car to the south of Ball's and was facing north). [90, ¶¶ 6–7; 90, Exhibit 4 (Cortes Deposition), at 38:13–39:2, 43:5–7.] Officers Marcus Duncan and John Thill also arrived at the scene in a police vehicle and stopped near Officer Cortes. [90, ¶ 8; 90, Exhibit 5 (Duncan Deposition), at 16:17–17:2, 24:9–21.] Officers Cortes, Duncan, and Thill thereafter fired their weapons at Ball because, they claim, Ball's vehicle began to move in the direction of Officer Cortes. [90, ¶ 12; 90, Exhibit 4 (Cortes Deposition), at 39:3–5; 90, Exhibit 5 (Duncan Deposition), at 24:16–21.] Ball denies that his vehicle was moving when the officers began firing at him. [90, ¶ 13; 90, Exhibit 1 (Ball Deposition), at 124:10–20.]

Salgado was not directly involved in the initial chase of Ball. Instead, Salgado came to the scene after hearing a "shots fired" radio call that had gone out during an earlier portion of the

---

[1] Officer Salgado is the only defendant moving for summary judgment, and the parties agree that material disputes of fact exist as to the other defendant officers. See [89, at 1; 91, at 2.]

chase after an officer accidentally discharged his weapon in the area of 5400 S. Indiana. [90, ¶¶ 4–5, 20; 90, Exhibit 3 (Stapleton Testimony), at 109:11–14.] Salgado was a passenger in a marked police SUV driven by his partner. The SUV drove northbound on Calumet before stopping at the scene of 5600 S. Calumet. [90, ¶ 9; 92, ¶¶ 18–19; 92, Exhibit C (Salgado Deposition), at 16:18–22.] The SUV was facing northwest when it came to a stop and was facing in that direction at the time of the shooting. [90, ¶ 10.]

Once the SUV came to a stop, Salgado exited and stood near the passenger's side door, while his partner remained inside the vehicle. [92, ¶ 20.] Salgado testified that, as soon as he exited the SUV, he heard gunshots to the west of where he was standing. [90, ¶¶ 16, 20; 92, Exhibit C (Salgado Deposition), at 22:20–23:6.] Salgado then fired his weapon at Ball. [90, ¶ 18.] Salgado also testified at his deposition as follows regarding his discharge of his firearm:

> A:     **I believed Mr. Ball was firing upon me.**
>
> Q:     And what led you to believe that?
>
> A:     **"As I exited the vehicle, I—I can hear multiple gunshots going off, and as I turn my body towards Mr. Ball's vehicle, he's got the door open, he's got his hands pressed against his chest so I can't see his hands, and he's making a lunging motion towards me."**

[92, Exhibit C (Salgado Deposition), at 29:13–20.] Salgado did not see any other police officers at the scene before firing his weapon, and he did not see Ball's vehicle driving toward a police officer. [90, ¶ 19; 92, Exhibit C (Salgado Deposition), at 33:4–6.] According to Salgado, because of (1) the positioning of Ball's hands, (2) the manner in which Ball lunged in Salgado's direction, and (3) the earlier radio call about "shots fired" and the fact that he had just heard shots fired, Salgado believed Ball had a weapon. [90, ¶ 20; 90, Exhibit 2 (Salgado Responses to Ball's Interrogatories), ¶ 8.]

According to Ball, as soon as his car became stuck in the snow, he raised his hands with his palms up and heard shots being fired.  [92, ¶ 12.]   While the officers were still shooting at him, Ball tried to get out of his car by reaching for the driver's side door with his left hand.  [90, Exhibit 1 (Ball Deposition), at 142:15–21.]  The shooting continued while Ball exited the car:  "I get out while they was shooting. * * * I never got on chance to stand all the way up.  They was shooting the whole time." [90, Exhibit 1 (Ball Deposition), at 142:8–9, 143:2–3.]   Ball also testified at his deposition that he did not know what he was doing with his right hand as he exited his car, and that "[m]y hands was up until the time they started shooting.  After that, I don't remember nothing but that bullet hitting me in the head.  And that—I just reached for the door after that.  I reached for the door after I got hit in the head."  [90, Exhibit 1 (Ball Deposition), at 144:19–23.]  Once Ball exited the car, before he could stand up, he was shot in the leg.  This shot knocked him to the ground and spun him around so that, while he had previously been facing south, he ended up on the ground facing north.  [92, ¶¶ 16–17; 90, Exhibit 1 (Ball Deposition), at 142:8–14, 143:14–144:3.]

After the shooting, police personnel photographed Plaintiff's vehicle and Investigator Herbert Keeler used these photographs to generate what is known as a "Leica Scan."  [92, ¶¶ 21–22; 92, Exhibit D (Leica Scan).]   A Leica Scan is a scan of a crime scene that allows investigators to measure items at the crime scene.  [92, Exhibit E (Keeler Deposition), at 10:9–18.]  The Leica Scan of Ball's vehicle demonstrates that two bullet holes entered the driver's side door of Ball's vehicle.  [92, ¶ 23.]  The parties dispute whether the Leica Scan also demonstrates the exact trajectory of these bullets. Ball maintains that the bullets entered his vehicle from a northwest angle (and therefore came from the direction in which Salgado was standing).  [92, ¶¶ 21, 23.]

As a result of the incident, Ball was convicted of a crime relating to fleeing from the police. [90, ¶ 2.] Ball thereafter brought this lawsuit on December 9, 2011, and filed an amended complaint [16] on March 21, 2012. Ball alleges in Count I of his amended complaint that Officer Salgado unreasonably used deadly force against him "[w]ithout just cause or just provocation" when Salgado discharged his weapon at Ball. [16, ¶ 10.] The Court stayed the action in April 2012 while Ball pursued an appeal of his criminal conviction in state court. [See 23.] After the stay was lifted, and the parties proceeded with discovery [see 33] and Salgado filed the instant motion for summary judgment [89].

## II.     Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a). In determining whether summary judgment is appropriate, the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor (here, Ball). *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013) (citation omitted). Rule 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against any party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party would bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In other words, the moving party may meet its burden by pointing out to the court that "there is an absence of evidence to support the nonmoving party's case." *Id*. at 324.

To avoid summary judgment, the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). For this

reason, the Seventh Circuit has called summary judgment the "put up or shut up" moment in a lawsuit—"when a party must show what evidence it has that would convince a trier of fact to accept its version of events." See *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007). In other words, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## III.  Analysis

Salgado moves for summary judgment on Count I, arguing that the undisputed evidence establishes that he reasonably believed Ball was shooting at him when he fired his gun at Ball, and therefore his use of force was reasonable given the circumstances known to him at the time. [89, at 1.] Salgado alternatively argues that he is entitled to qualified immunity. [*Id.*, at 5–6.]

### A.  Excessive Force

Claims of excessive force, including claims of deadly force, in the context of an arrest, investigatory stop, or other seizure are analyzed under the Fourth Amendment's objective reasonableness standard. See *Graham v. Connor*, 490 U.S. 386, 395 (1989); see also *Scott v. Edinburg*, 346 F.3d 752, 756 (7th Cir. 2003) ("A police officer's use of deadly force constitutes a seizure within the meaning of the Fourth Amendment, and therefore it must be reasonable."). "An officer's use of force is unreasonable from a constitutional point of view only if, 'judging from the totality of circumstances at the time of the arrest, the officer used greater force than was reasonably necessary.'" *Gonzalez v. City of Elgin*, 578 F.3d 526, 539 (7th Cir.2009) (quoting *Lester v. City of Chi.*, 830 F.2d 706, 713 (7th Cir.1987)). A reasonableness inquiry involves "a

careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Gonzalez*, 578 F.3d at 539 (quoting *Graham*, 490 U.S. at 396). "[T]he severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight" are all factors that courts should consider in this inquiry. *Graham*, 490 U.S. at 396 (citation omitted). An officer specifically may use deadly force "if the suspect poses a threat of serious physical harm, either to the officer or to others." *Bell v. Irwin*, 321 F.3d 637, 639 (7th Cir. 2003) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). "If the suspect threatens the officer with a weapon * * * that risk has been established." *Bell*, 321 F.3d at 639 (internal alterations and citation omitted).

This reasonableness inquiry must focus on "the information [the officer] possessed and the judgment he exercised in responding to that situation." *Sherrod v. Berry*, 856 F.2d 802, 804–05 (7th Cir. 1988) (en banc). In other words, because law enforcement officers "must make critical, split-second decisions in difficult and potentially explosive situations," reasonableness should be judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010) (quoting *Graham*, 490 U.S. at 396–97). Notably, "summary judgment is often inappropriate in excessive-force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations." *Cyrus*, 624 F.3d at 862 (citing *Catlin v. City of Wheaton*, 574 F.3d 361, 367 (7th Cir.2009)).

According to Salgado, the circumstances known to him at the time of the shooting— including Ball's physical movements, the sound of gunshots, the "shots fired" radio call, and the fact that from his vantage point he could not see any other officers firing their weapons—would

cause a reasonable officer to believe that Ball was shooting at him.  Thus, Salgado argues, his decision to use deadly force was objectively reasonable under the circumstances known to him at the time.  Ball, in turn, contends that a jury could conclude that Salgado's belief that Ball had a weapon was unreasonable.  To support this argument, Ball points to (1) testimony given by a nonparty witness, Dalton Atkinson, at Ball's underlying criminal trial, (2) the results of the Leica Scan, (3) Defendant Salgado's deposition testimony, and (4) Ball's own testimony.  Ball contends that a jury could infer from Atkinson's testimony that Salgado was actually the first officer to fire his weapon at Ball.  Ball also submits that the Leica Scan shows that two bullets entered the vehicle's driver's side door from the direction in which Salgado was shooting, which, according to Ball, casts doubt on Salgado's testimony that he heard gunshots when he arrived at the scene and that Ball's car door was already open.  Ball also cites Salgado's deposition testimony regarding his observations of Ball's movements when he arrived at the scene, as well as Ball's own deposition testimony about his movements at that time, both of which call into question whether Salgado could have reasonably believed that Ball was firing a weapon before Salgado discharged his own firearm.

The Court will first address Ball's extensive reliance on the criminal trial testimony of Dalton Atkinson.  At the prior criminal trial, Atkinson testified that he lived near the site of the shooting in 2009 and was able to observe it from his window.  [92, ¶¶ 3–9; 92, Exhibit B (Atkinson Testimony), at 5:15–17, 6:8–12.]  According to Atkinson, once he heard sirens on the night of December 29, 2009, he looked out his window onto Calumet and observed police cars as well as a car driving on the sidewalk.  [92, ¶¶ 5–7.]  As he watched, a police SUV stopped in the road beside the sidewalk.  [*Id.*, ¶ 8.]  Atkinson testified that he saw the officer near the police SUV—Salgado—fire his weapon first, after which "everybody else started shooting."  [92,

¶¶ 13–14; 92, Exhibit B (Atkinson Testimony), at 12:18–24; 31:13–20.] He also testified that he did not see any individuals standing in the area near the vehicle at the time. [92, Exhibit B (Atkinson Testimony), at 12:5–7.] Ball argues that this testimony raises a genuine issue of material fact as to whether Salgado could have reasonably believed that Ball was firing a weapon at him when Salgado discharged his own weapon.

In his reply brief, Salgado raises substantial questions concerning the admissibility of Atkinson's testimony, contending that it should be excluded as hearsay. Given the sequencing of the briefs, Ball has not had an opportunity to respond to that contention. If the disposition of the instant motion turned on the admissibility of the Atkinson testimony, the Court would have requested a sur-reply prior to issuing its opinion. However, as explained below, irrespective of the admissibility of Atkinson's prior testimony, Ball points to other evidence in the record that gives rise to triable issues of fact. Accordingly, the Court need not definitively sort out at this time the hearsay question that surfaced in Salgado's reply brief.

The Court next turns to the remainder of the evidence to which Ball points in opposing Salgado's motion, starting with the Leica Scan of Ball's vehicle. The parties agree that this scan demonstrates two bullets entered the driver's side door of Ball's vehicle. [96, ¶ 23.] Ball asserts that these bullets entered from a northwest angle—in other words, they came from the direction that Salgado was shooting. The investigator who generated this scan, however, never testified that the bullets entered the driver's side door from a northwest angle. [92, Exhibit E (Keeler Deposition).] Construing this physical evidence in Ball's favor only demonstrates that someone shot at the door of Ball's vehicle and thus, by itself, the Leica Scan would present, at best, a borderline case from which to challenge Salgado's account of the shooting and whether he was

objectively reasonable in his belief that Ball had a weapon in his hands when he discharged his firearm.

But the Court need not decide whether the testimony on the Leica Scan results alone would require a trial in this case, for the factual disputes in the record based on the depositions and written discovery responses of the two principal protagonists—Ball and Salgado—raise genuine issues of material fact concerning whether Salgado could have reasonably believed that Ball was firing a weapon at him, thus precluding summary judgment in Salgado's favor. Salgado has pointed to two factors specific to Ball's actions on the night of the shooting that formed the basis of his belief that Ball was firing a weapon: the positioning of Ball's hands and the manner in which Ball lunged "in [his] direction." [90, ¶ 20; 90, Exhibit 2 (Salgado Responses to Ball's Interrogatories), ¶ 8.] Ball counters that he was never in a position to lunge at Salgado because he never facing in Salgado's direction. According to Ball's testimony, as he was attempting to exit his car once the shooting began, he "was still facing out towards the front of the car, which * * * would be facing south." [92, Exhibit A (Ball Deposition), at 143:22–24.] Then, once his leg was hit with a bullet, he was immediately knocked down and spun around "facing north." [Id., at 144:2.] Salgado was facing at least partially southwest at the time he fired his weapon. [90, ¶ 18.] A reasonable jury could credit Ball's testimony that he never faced Salgado's direction, and conclude that Salgado's belief that Ball was in the process of firing a weapon at him was unreasonable. Because of the relatively few specific actions by Ball to which Salgado points as the basis for his belief that Ball was firing a weapon at him, a reasonable jury crediting Ball's testimony could therefore conclude that this belief was unreasonable.[2] See

_____

[2] The Court points out that Salgado relies on relatively few specific actions of Ball to support his belief that Ball was firing a weapon at him not because that makes his account less credible, but because that makes each of the factors to which Salgado points material in assessing whether summary judgment is appropriate. In other words, whether or not Ball could have been facing Salgado, and therefore lunging at

*Abdullahi v. City of Madison*, 423 F.3d 763, 772–73 (7th Cir. 2005) (reversing grant of summary judgment for defendant police officers on excessive force claim because the cumulative weight of medical evidence supported an inference of unreasonable conduct on the officers' part); *Coleman v. Wiencek*, 2010 WL 1506708, at *5 (N.D. Ill. Apr. 13, 2010) (denying summary judgment on an excessive force claim because there was a genuine issue of material fact concerning whether the person shot by police could have been perceived as holding a gun, and so "a reasonable jury could find that [the defendant's] use of deadly force was unreasonable"); *Lee v. McNeal*, 2008 WL 4812653, at *3–4 (N.D. Ill. Oct. 29, 2008) (holding that genuine factual disputes remained in the case that related to "the reasonableness of [defendant's] actions at the time he fired his weapon," thus precluding summary judgment).

This situation is therefore distinguishable from cases that Salgado cites where summary judgment on excessive force was granted for the defendants. In these cases, the threat posed to the defendant police officers was undisputed. See *Plakas v. Drinski*, 19 F.3d 1143, 1146 (7th Cir. 1994) (affirming grant of summary judgment for defendant on excessive force claim where the defendant officer "was faced with a man who had, minutes before, attacked a police officer with a dangerous weapon, had refused several entreaties to disarm, had told the officer that one of the two would die that night, and then had moved toward the officer while raising his weapon to strike"); *White v. Ficaro*, 2001 WL 109813, at *4 (N.D. Ill. Feb. 2, 2001) (granting summary judgment to defendants where the undisputed facts demonstrated that the decedent had a gun pointed at the defendants, refused to drop the gun, and then advanced on the defendants);

---

him, is not a minor detail about what Salgado observed when he arrived at the scene. It is a significant factor that Salgado has identified as a basis for his belief that Ball was firing a weapon at him and, as such, a discrepancy as to whether that actually happened is enough to preclude summary judgment in Salgado's favor. *Cf. Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir. 1994) (discrepancy as to whether defendant police officer ran into a "tree" or a "sapling" "is not enough to allow a rational trier of fact to decide against" the defendant).

*Howard v. City of Freeport*, 2010 WL 5175083, at *3 (N.D. Ill. Nov. 30, 2010) (granting summary judgment to defendants on excessive force claim where "the record is undisputed that decedent was moving quickly down a flight of stairs towards [the police officers] while brandishing a knife" and that the officers "demanded that decedent drop the knife at least twice prior to any gunshots"); *Cooper v. City of Rockford*, 2010 WL 3034181, at *6 (N.D. Ill. Aug. 3, 2010) (granting summary judgment to defendant officer on excessive force claim where "plaintiff has not provided any affirmative evidence to materially dispute * * * that [the decedent] at least began to turn and face [defendant], had his arm extended towards him in a shooting position, and refused to comply with [defendant's] instructions to get down and put his hands up").

The Court is cognizant of the fact that a case should not go to a jury when material facts surrounding the reasonableness of police actions are undisputed, because then "there would be nothing for a jury to do *except* second-guess the officers." *Bell*, 321 F.3d at 640. But here, material disputes of fact remain regarding where Ball was facing when Salgado discharged his firearm and whether he could have been lunging in Salgado's direction. This is a material fact because Salgado has identified Ball's movements in his directions as a basis for his belief that Ball was firing a weapon at him. A reasonable jury could conclude that Ball was not lunging at Salgado, and thus it was unreasonable for Salgado to believe that Ball was firing a weapon.

### B. Qualified Immunity

Salgado alternatively argues that he is entitled to qualified immunity on Count I. A government official may be entitled to qualified immunity that protects him from liability for civil damages "insofar as [his] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*,

555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "'In determining qualified immunity at the summary judgment stage, the court asks two questions: (1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation.'" *Kristofek v. Vill. of Orland Hills*, 832 F.3d 785, 798 (7th Cir. 2016) (quoting *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 648 (7th Cir. 2013)). Salgado argues that he is entitled to qualified immunity because there is no "clearly established law" that an officer who believes he is being fired upon is not permitted to fire back. [89, at 5–6.] As discussed above, however, taking the facts in the light most favorable to Ball, there are disputed questions of material fact concerning whether Salgado's belief that he was being fired upon by Ball was objectively reasonable and, therefore, whether it constitutes a violation of Ball's constitutional rights. "It has been well established for years that the use of deadly force must be reasonable," so the issue in this case "does not involve whether the claimed constitutional right was clearly established." *Coleman*, 2010 WL 1506708, at *6. Therefore, the Court cannot determine whether Salgado is entitled to qualified immunity at this stage. See *Gonzalez*, 578 F.3d at 540 ("When the qualified immunity inquiry cannot be disentangled from disputed facts, the issue cannot be resolved without a trial.") (quoting *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996)).

In sum, assessing cumulatively all of the evidence presented by Ball and viewing the evidence as a whole, in the light most favorable to Ball as the Court must, a reasonable factfinder could conclude that Salgado could not have reasonably believed that Ball was firing a weapon at him when he used deadly force. For this reason, Salgado's motion for summary judgment [89] is denied.

## IV.     Conclusion

For the reasons explained above, Salgado's motion [89] is respectfully denied.  This case is set for further status hearing at 9:30 a.m. on March 6, 2018.


Date: February 16, 2018

_____
Robert M. Dow, Jr.
United States District Judge